## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**MARCIA VANCANNON**                                        **PLAINTIFF**

**VS.**                          **CASE NO. 3:21CV00126 PSH**

**KILOLO KIJAKAZI, Acting Commissioner,**
    **Social Security Administration**                     **DEFENDANT**

### ORDER

Plaintiff Marcia VanCannon ("VanCannon"), appeals the final decision of the Commissioner of the Social Security Administration (defendant "Kijakazi") to deny her claim for Disability Insurance benefits ("DIB").  VanCannon maintains the Administrative Law Judge ("ALJ") erred by finding she could perform other work in the economy.  The parties have ably summarized the testimony given at the administrative hearing conducted on November 17, 2020. (Tr. 24-43).  The Court has carefully reviewed the record, including the medical records, to determine whether there is substantial evidence in the administrative record to support Kijakazi's decision.  42 U.S.C. § 405(g).  The relevant period under consideration is from February 1, 2018, the alleged onset date, through January 8, 2021, the date of the ALJ's decision.

1

*The Administrative Hearing:*

In response to questions posed by the ALJ, VanCannon stated she was 52 years old and lived alone.  She attended college for a few years.  She stated she could cook, clean, do laundry, yard work, and chores but "not like I used to be able to.  Not to my standards. . ." (Tr. 28).  VanCannon allowed that her elderly parents, kids, and fiancé provide daily assistance.  VanCannon testified she could drive but that if she drove too far her shoulders, neck, and back would hurt.  She gets help with grocery shopping. VanCannon estimated that she could walk for 30 minutes on flat ground, although "each day varies." (Tr. 29).  Too much walking caused problems with her hips and lower back.  Although she does not use a cane, VanCannon leans on those around her for support at times.  She indicated problems with lifting and carrying, stating she could pick up 15-20 pounds and move the weight 10 feet, but not repeatedly.  She would need to adjust after sitting 15-20 minutes.

VanCannon listed Gabapentin, Flexeril, and a stomach medication as daily prescriptions, as well as a headache medication (Toradol) taken as needed.  A side effect of the Gabapentin is memory problems, according to VanCannon.  She stated she had not received any therapy or counseling.  VanCannon received injections for her back and neck problems without noticeable relief.  The lower back injections provided relief for only a week or two.

2

VanCannon described her past work providing in-home care and nursing home assistance for residents.  She helped the residents with their activities of daily living.  VanCannon testified she was unable to perform these jobs now because of back and shoulder pain from pushing and pulling, headaches, inability to bend, unsteadiness, and inability to hold out her arm to assist residents/patients.

VanCannon's attorney questioned her further.  In response, she said she had injuries at work in 2015 and 2016, which were treated with chiropractic care.  More recently, she was being seen for pain management at Richardson Orthopedic, but had no lasting relief.  After her earlier problems, VanCannon stated she unsuccessfully attempted to return to work, and was let go "because I couldn't do the job."  (Tr. 36).  Now, VanCannon said she could not be on her feet for 5-6 hours in a work day, and would need a break every 30 minutes.  Also, she stressed that too much activity on one day resulted in ongoing problems the following day.  She estimated she could not lift 15-20 pounds for 2-3 hours in a day.  After a recent MRI, VanCannon was seen by a surgeon, who recommended neck and lower back surgery.  VanCannon has not had either surgery, and explained that she was particularly hesitant for the lower back surgery due to concerns about pain and loss of mobility.  (Tr. 27-39).

Elizabeth Clem ("Clem"), a vocational expert, testified.  The ALJ posed a series of hypothetical questions to Clem.  The first question asked Clem to consider a

3

hypothetical worker of VanCannon's age, education, and experience, who could perform light work with the following restrictions: she could not climb ropes, ladders, or scaffolds; could occasionally climb ramps and stairs; and could occasionally stoop, crouch, crawl, and kneel. Clem responded that such a worker could not perform VanCannon's past relevant work, which was performed at the medium exertional level. Clem testified, however, that such a worker could perform light exertional jobs, such as housekeeper and cashier. Clem stated no jobs would be available to VanCannon if she were limited to sedentary work. (Tr. 40-43).

*ALJ's Decision:*

In his January 8, 2021 decision, the ALJ determined VanCannon had the severe impairment of degenerative disc disease of the lumbar and cervical spine. The ALJ found that VanCannon had no medical determinable chronic respiratory impairment. The ALJ considered the "paragraph B" criteria regarding mental impairments, finding VanCannon had no limitation in understanding, remembering, or applying information, no limitation in interacting with others, a mild limitation in concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing oneself.

The ALJ found VanCannon did not have an impairment or combination of impairments that met a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. The

4

ALJ expressly considered if VanCannon met Listing 1.04 (disorders of the spine).

According to the ALJ, VanCannon had the residual functional capacity ("RFC") to perform light work with the restrictions which mirrored those detailed in the initial hypothetical question posed to Clem.   With regard to VanCannon's subjective allegations, the ALJ found them "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 15).  The ALJ discussed the medical evidence, beginning with treatment notes from  2015, when VanCannon experienced hip pain while transferring a patient at work.  The ALJ also cited a January 2019 motor vehicle accident and ensuing treatment, injections received in 2019, headaches which accompanied the injections, and pain management treatment beginning in October 2019.  The ALJ also noted a November 2019 evaluation and bilateral medial branch blocks administered at that time.  Imaging results from March 2020 were addressed, as well as a lumbar epidural steroid injection given in June 2020.  Finally, the ALJ also considered the medications taken by VanCannon, her physical therapy records, and some treatment notes.

The ALJ found that the opinions of the state agency medical experts, who opined VanCannon could perform a range of light work, were "generally persuasive." (Tr. 16).  While these physicians acknowledged her degenerative disc disease, they also found her neurological functions intact and noted her conservative treatment.  The

state agency psychological consultants found that VanCannon's mental impairments were nonsevere, an opinion which the ALJ deemed consistent with and supported by her lack of any significant mental health treatment.

The ALJ determined VanCannon could not perform her past relevant work. However, relying upon Clem's testimony, the ALJ held VanCannon could perform other light work in the national economy. Accordingly, the ALJ concluded she was not disabled. (Tr. 11-18).

*VanCannon's Claim – ALJ Error in Finding She Could Perform Other Work in the National Economy*

VanCannon claims four faults with the ALJ's conclusion that she can perform light work.

*Imaging Results*

First, she argues that the ALJ's finding is at odds with objective imaging results, citing the findings of cervical and lumbar MRIs conducted in March 2020. The cervical MRI results found a herniated disc at C2-3 impinging the anterior thecal space; a bulging disc at C3-4 causing impingement and flattening of the ventral aspect of the spinal cord; a broad-based herniated disc at C4-5 causing moderate cord compression, moderate narrowing of the right neural foramen and moderate to marked narrowing of the left neural foramen; a broad-based herniated disc at C5-6, causing

6

mild cord compression and moderate to marked bilateral foraminal narrowing; a broad-based herniated disc at C6-7, causing mild cord compression and mild bilateral foraminal narrowing; and degenerative disc disease.

The 2020 lumbar MRI results showed a broad-based herniated disc at L1-2, causing impingement of the dural sac and moderate bilateral foraminal narrowing; a herniated disc at L2-3, causing moderate narrowing of the right neural foramen; a broad-based herniated disc at L3-4, causing mild central stenosis, moderate narrowing of the right neural foramen, and marked narrowing of the left neural foramen; a broad-based herniated disc at L4-5, causing moderate to marked bilateral foraminal narrowing; and bilateral herniations at L5-S1, causing moderate narrowing of the right neural foramen.  Docket entry no. 16, pages 20-21.

VanCannon argues that the results of these March 2020 imaging tests call into question the ALJ's reliance on the state agency physicians who opined that she could perform some light work and suffered from degenerative disc disease.  The state agency physicians offered their opinions before the March 2020 imaging tests were conducted, and thus did not have the benefit of those test results.[1]  Other imaging tests were examined by the state agency physicians.  CTs of the thoracic spine, cervical

---

[1]

The initial state agency consideration was made on August 30, 2019, and the reconsideration was rendered on January 9, 2020.  (Tr. 43-57, 60-76).

spine, and lumbar spine were performed on January 20, 2019, following VanCannon's involvement in a motor vehicle accident.[2]   The thoracic spine CT reflected "grossly patent neural foramina and spinal canal," or normal findings, with no acute bony findings. (Tr. 548).   The cervical spine CT showed no substantial spinal canal stenosis at C2-3, C3-4, C6-7, and C7-T1.   There was mild facet arthropathy at C2-3 and mild to moderate left neural foraminal stenosis at C4-5, and mild to moderate right neural foraminal stenosis, moderate left neural foraminal stenosis, and mild spinal canal stenosis at C5-6.   The overall impression was "no acute bony findings.   Multilevel degenerative changes."   (Tr. 551).   The lumbar spine CT showed mild facet arthropathy at several locations, some mild to moderate spinal canal stenoses, and the overall impression was again "no acute bony findings.   Multilevel degenerative changes." (Tr. 553).

The Court notes that the state agency physicians had available to them, in addition to the CT results, VanCannon's medical records which documented negative straight leg raises and intact neurological findings and sensation; intact motor function and gait; and normal range of motion.   Nonetheless, the Court might have some concern about the state agency opinions since they could not consider the March 2020

---

[2] VanCannon was ambulatory at the accident scene, according to hospital records.   On examination she was found to have "very mild" pain and normal range of motion is her back and neck.   (Tr. 555).

MRI results, were it not for the evaluation of them, and examination of VanCannon, by neurosurgeon Rebecca J. Barrett-Tuck ("Tuck") on March 24, 2020. Tuck's physical exam noted normal range of motion in VanCannon's neck, with sensation, motor function, coordination and gait intact. Tuck examined the cervical and lumbar MRIs, finding severe multilevel degenerative disc disease in both areas. Tuck noted "significant spinal canal stenosis at C4-C5 and C5-C6" and graded the stenosis as moderate. (Tr. 742). As a result, Tuck recommended surgeries but also noted VanCannon's condition was not so severe that the surgery was urgent. VanCannon informed Tuck "she is not interested in surgical intervention but would prefer to manage her pain conservatively if at all possible." (Tr. 742).

When VanCannon returned to Tuck's office in June 2020, she was seen by nurse practitioner Kelsey Marie Schmidt ("Schmidt"). Her physical exam again showed normal range of motion in her neck and intact gait, and the treatment plan was to refer VanCannon for physical therapy for her cervical radiculopathy, cervical spine stenosis, lumbar radiculopathy, degenerative disc disease, herniated nucleus pulposus, hip pain, thoracic spine pain, and cervical stenosis of spinal canal. Schmidt recorded that VanCannon was "eager to continue with conservative therapy" and would "follow-up with pain management" and "hopes to continue to preserve her strength." (Tr. 737).

9

Ultimately, VanCannon's argument that the ALJ erred in considering the imaging studies in the record fails. The medical findings, including Tuck's findings, and conservative treatment following the March 2020 imaging studies, are substantial evidence supporting the ALJ's conclusion.

*"Intact Neurological Function"*

VanCannon next contends the ALJ erred in crediting the state agency physicians' citation of "intact neurological function" to support their conclusion that she could perform light work with limitations. VanCannon argues that her treating physicians repeatedly found decreased flexion and extension of the neck, decreased range of motion of the cervical spine, bilateral trigger points in the cervical spine, decreased range of motion in the lumbar spine, trigger points in the lumbar spine, diminished deep tendon reflexes in the upper extremities, weakness in motor strength, a positive Spurling's test bilaterally, positive straight leg raises, and antalgic gait. According to VanCannon, these numerous findings undermine the ALJ's assessment of intact neurological function.

This argument lacks merit. Even assuming there are more findings of arguably neurological impairments than not, the ALJ is not obliged to tally the treatment notes and adopt the greater number of entries. Instead, the ALJ must support his decision with substantial evidence, and reversal is not required even if substantial evidence

10

would have supported a different outcome.  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  Here, substantial evidence is present, as the medical records also show findings of normal strength, normal gait, normal range of motion, and intact sensation. These findings span much of the relevant period for purposes of this application.  For example, VanCannon exhibited normal range of neck and back motion and a negative exam for acute musculoskeletal changes in January 2019 immediately following her automobile accident.  (Tr. 555).  Treating physician Kelly Fletcher ("Fletcher") recorded "Neurological Exam: grossly intact" in January, February, March, and August 2019.  (Tr. 569, 572, 575, 639).  Negative straight leg raises were recorded in October 2019 and twice in March 2020 by three different providers (APRN Amber Sloan, Dr. Clinton Smith, and Tuck, respectively).  (Tr. 654, 713, 725).  A normal gait was observed by Tuck and Schmidt in March and June 2020.  (Tr. 725, 735). Substantial evidence supports the ALJ's assessment of VanCannon's neurological abilities.

*Conservative Treatment*

VanCannon disagrees with this statement from the ALJ: "Subsequent treatment records indicate continued conservative treatment for generally stable symptoms, consistent with" the opinions offered by the state agency physicians.  (Tr. 17). VanCannon is correct that her treatment was wide-ranging — she was prescribed

medications, received multiple injections for pain, underwent physical therapy and aqua therapy, and was prescribed a neck, back, and wrist brace. This variety of treatment does not disprove that the course of treatment trended conservatively. One example of the conservative course is VanCannon declining Tuck's recommendation of surgery in favor of pain management in March 2020. (Tr. 742). Another example is VanCannon declining pain medication from APRN Amber Sloan in October 2019. (Tr. 654). In addition, Dr. Travis Richardson ("Richardson"), who prescribed the braces, noted in November 2019 that he would continue conservative treatment protocols, and in December 2019 that "we will proceed forth with symptomatic treatment, medications, simple injections, and other conservative treatment modalities." (Tr. 665, 675). Substantial evidence supports the ALJ's assessment of VanCannon's treatment.

*Embellishment of Daily Activities*

VanCannon testified to limited daily activities, including an inability to drive long distances and an inability to do chores and yard work as well as she could in the past. On several occasions she reported to Richardson difficulties in performing activities of daily living. Richardson also recorded in November 2019 that VanCannon experienced pain with attempts to get on the exam table. (Tr. 675). The ALJ considered VanCannon's testimony about her symptoms but found "they are

inconsistent because the medical evidence of record indicates neck and back pain, treated with conservative therapy, and activities of daily living consistent with light work such as housework and light yard work." (Tr. 15).

The ALJ did not err in considering VanCannon's daily activities, which is one of many factors to be addressed in determining a claimant's residual functional capacity. *See Pearsall v. Massanari*, 274 F.3d 1211 (8th Cir. 2001) and Social Security Ruling ("SSR") 16-3p. The ALJ rightly discussed other factors rather than fully accepting VanCannon's subjective allegations. While VanCannon complained at times of pain preventing her from performing daily activities, there were other times when her pain was not as limiting. For example, one month before Richardson noted difficulty in transferring to the exam table, APRN Sloan recorded VanCannon "transfers from sitting position to exam table without difficulty." (Tr. 654). On that same occasion VanCannon reported she was not currently taking pain medication and rated her pain at 3 on 0-10 scale. (Tr. 651). While VanCannon would no doubt have weighed the relevant factors, including her daily activities, differently, the ALJ did not err in his analysis. It is worth remembering that the ALJ credited VanCannon's subjective allegations to a degree, resulting in restrictions beyond the state agency physicians' opinion that VanCannon could perform the full range of light work. There is no merit to this claim.

13

In summary, Kijakazi's decision was supported by substantial evidence. The Court is mindful that its task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion. The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). This test is satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of Kijakazi is affirmed and VanCannon's complaint is dismissed with prejudice.

IT IS SO ORDERED this 6th day of June, 2022.

_____
UNITED STATES MAGISTRATE JUDGE